# United States District Court

### EASTERN DISTRICT OF TEXAS
### SHERMAN DIVISION

|  |  |  |
|---|---|---|
| | § | |
| BARZ ADVENTURES INC. d/b/a BAR-Z | § | |
| MOBILE DEVELOPMENT, | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | Civil Action No.  4:20-CV-299 |
| v. | § | Judge Mazzant |
| | § | |
| TIMOTHY PATRICK and APP STAR, | § | |
| LLC, | § | |
| | § | |
| *Defendants.* | § | |

## <u>MEMORANDUM OPINION AND ORDER</u>

Pending before the Court is Plaintiff's Motion for Summary Judgment (Dkt. #143).  Having considered the motion and the relevant pleadings, the Court finds that the motion should be **GRANTED in part** and **DENIED in part.**

## BACKGROUND

This case arises out of a former employer-employee relationship whereby Defendant Timothy Patrick ("Patrick") used to work for Plaintiff BarZ Adventures Inc. d/b/a Bar-Z Mobile Development ("Bar-Z").  Bar-Z is a company based in Austin, TX that is in the business of creating mobile applications, designed to run on a mobile device and perform certain functions, such as games, ticket purchasing, or mapping, depending on the client (Dkt. #120 at p. 3).  Bar-Z has a civic division, zCivic, that is tasked with developing applications that support municipalities, parks and attractions, main street organization, tourism, and nonprofit organizations (Dkt. #120 at p. 3). In March of 2017, Bar-Z hired Patrick as the Director of Sales (Dkt. #143 at p. 5).

As part of his employment, Patrick signed an Employment, Confidential Information and Invention Assignment Agreement ("Employment Agreement") with Bar-Z (Dkt. #120 at p. 4).

The Employment Agreement included a confidentiality and non-compete provision that mandated Patrick to keep Bar-Z's information confidential and restricted Patrick from competing with Bar-Z for the twelve (12) months after his employment concluded (Dkt. #120 at p. 4; Dkt. #143, Exhibit 1 at pp. 9–10).

During his time at Bar-Z, Patrick assisted the company to work on certain mobile applications for various chambers of commerce (Dkt. #143 at p. 6).  These applications contained information, using a "block architecture" format, about various hotspots in the local community as well as other local businesses for residents or tourists to locate (Dkt. #143 at p. 6).[1]  Bar-Z would also sell advertisements on these chamber applications to receive a profit (Dkt. #143 at p. 6).  Bar-Z released a number of applications with this format, including "I Love Granbury," "Passport 2 Midland," "Our Odessa," and "SWLA Connection" (Dkt. #143 at p. 9).  Part of Patrick's role in this department was to create certain marketing materials for the applications and a list of potential chambers of commerce that could be future clients with Bar-Z (Dkt. #143, Exhibit 1 at pp. 4, 6). An employee of Bar-Z heard Patrick express his frustration about the company from time to time, and in doing so, Patrick would state that he could leave Bar-Z and do exactly what Bar-Z was doing on his own. When the employee would remind him that he signed a non-compete, Patrick responded that "non-compete agreements are not enforceable in Texas" (Dkt. #143, Exhibit 34 ¶ 3).

In September of 2018, Bar-Z ultimately terminated Patrick for cause (Dkt. #120 at p. 6). Patrick signed a Termination Certification, acknowledging his termination as well as the provisions from his Employment Agreement that place a duty on Patrick to not compete and not

---

[1] Bar-Z defines its block architecture as "a particular screen on the app [that] is divided into segments or blocks" (Dkt. #120 at p. 6).  Exhibits 1-J and 10 show examples of this "block architecture" format (Dkt. #143, Exhibit 1 at p. 45; Dkt. #143, Exhibit 10 at p. 2).

disclose Bar-Z's confidential information once he left (Dkt. #120 at p. 6).   Following his termination, Patrick was eventually "homeless" and without a car, until he acquired a new job (Dkt. #143, Exhibit 2).

Bar-Z was informed of Patrick's employment with Defendant App Star, LLC ("App Star") in July of 2019 (Dkt. #120 at p. 6).   Patrick worked with App Star as their Director of Sales (Dkt. #143, Exhibit 11).   Bar-Z was also informed that Patrick had been working with App Star to create mobile applications just like the ones he had worked on while working at Bar-Z.   These applications included "Colleyville Now," "Princeton Now," and "Celina Connected" (Dkt. #81 at p. 2; Dkt. #120 at p. 6).   After discovering this information, Bar-Z President Lee Little ("Little") reminded Patrick of his contractual obligations and informed App Star's CEO Eugene Rice ("Rice") of the same (Dkt. #120 at p. 6).   Neither response indicated to Little that either Patrick or Rice intended to comply with Patrick's obligations under the Employment Agreement, as both individuals essentially told Little in separate conversations "what are you going to do about it?" (Dkt. #143, Exhibit 1 at p. 7).   Bar-Z subsequently filed suit.

On June 1, 2021, Bar-Z filed its Fifth Amended Complaint against the two remaining defendants, Patrick and App Star, for their conduct regarding the use of Bar-Z's trade secrets, in breach of the Employment Agreement that Patrick signed (Dkt. #120).   There are other defendants listed in the amended complaint, including Colleyville Chamber of Commerce and Rice, but they have since been dismissed by this Court or the Court has ordered default judgment against them (Dkt. #103; Dkt. #146).   Neither Patrick nor App Star have responded to the Fifth Amended Complaint, just as they did not respond to the Fourth Amended Complaint.   The last answers that Patrick and App Star filed were back on October 14, 2020, in response to Bar-Z's Third Amended Complaint, where Patrick and App Star filed twelve (12) and eleven (11) affirmative defenses,

respectively (Dkt. #66; Dkt. #68).    Additionally, Patrick and App-Star each filed several counterclaims against Bar-Z (Dkt. #66; Dkt. #68).  On October 23, 2020, Bar-Z responded to these counterclaims with its own affirmative defenses (Dkt. #78; Dkt. #81).

On March 3, 2022, Bar-Z filed the pending motion for summary judgment on all claims (Dkt. #143).  The Court finds that each of Bar-Z's claims have been conclusively proven, and that Patrick and App Star's affirmative defenses and counterclaims have no merit.  For the reasons discussed below, Bar-Z is entitled to judgment as a matter of law for its claims against both Patrick and App Star.

## LEGAL STANDARD

The purpose of summary judgment is to isolate and dispose of factually unsupported claims or defenses.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986).  Summary judgment is proper under Rule 56(a) of the Federal Rules of Civil Procedure "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).  A dispute about a material fact is genuine when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 248 (1986).  Substantive law identifies which facts are material.  *Id.*  The trial court "must resolve all reasonable doubts in favor of the party opposing the motion for summary judgment."  *Casey Enters., Inc. v. Am. Hardware Mut. Ins. Co.*, 655 F.2d 598, 602 (5th Cir. 1981).

The party seeking summary judgment bears the initial burden of informing the court of its motion and identifying "depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials" that demonstrate the absence of a genuine issue of material fact.  FED. R. CIV. P. 56(c)(1)(A); *Celotex*, 477 U.S. at 323.  If the movant bears the burden

of proof on a claim or defense for which it is moving for summary judgment, it must come forward with evidence that establishes "beyond peradventure *all* of the essential elements of the claim or defense." *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194 (5th Cir. 1986).  Where the nonmovant bears the burden of proof, the movant may discharge the burden by showing that there is an absence of evidence to support the nonmovant's case. *Celotex*, 477 U.S. at 325; *Byers v. Dall. Morning News, Inc.*, 209 F.3d 419, 424 (5th Cir. 2000).

A nonmovant's failure to respond to a motion for summary judgment does not entitle the movant to a default judgment. *Retzlaff v. de la Vina*, 606 F. Supp. 2d 654, 656 (W.D. Tex. 2009) (citing *Eversley v. MBank Dallas*, 843 F.2d 172, 174 (5th Cir. 1988)).  Rather, the Court may accept the movant's evidence as undisputed, and then conduct an analysis whether the summary judgment evidence establishes a prima facie showing of the movant's entitlement to judgment. *Id.* The Court must consider all the evidence but "refrain from making any credibility determinations or weighing the evidence." *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 343 (5th Cir. 2007).

## ANALYSIS

The Court will begin this analysis by outlining all the pending claims, affirmative defenses, and counterclaims that are outstanding in this case.

To start, Bar-Z alleges violations of the Texas Uniform Trade Secrets Act, the Federal Defend Trade Secrets Act, a breach of two different sections of Patrick's Employment Agreement, and a breach of fiduciary duty against Patrick.  Patrick raises the following twelve affirmative defenses: (1) preemption; (2) scope of copyright protection; (3) no copyright infringement; (4) lack of registration; (5) failure to mitigate; (6) unclean hands; (7) lack of standing; (8) contributory negligence; (9) estoppel; (10) Bar-Z's own breach of the contract; (11) arbitration; and (12)

unenforceability and unconscionability (Dkt. #68 at pp. 7–9).   Additionally, Patrick filed counterclaims against Bar-Z for a breach of contract, defamation, violations of the Texas Uniform Trade Secrets Act and Federal Defend Trade Secrets Act, as well as requesting a declaratory judgment that no copyright infringement existed (Dkt. #68 at pp. 11–14).  Bar-Z responded to the counterclaims by raising affirmative defenses of its own, including the use of privileged statements, the equitable doctrine of estoppel and unclean hands, excuse from performance due to a material breach in the contract, good faith claims, and a truth defense (Dkt. #78 at pp. 5–8).

Bar-Z also alleges violations of the Texas Uniform Trade Secrets Act, the Federal Defend Trade Secrets Act, tortious interference with the Employment Agreement, and a breach of fiduciary duty against App Star.  App Star responded with the following eleven affirmative defenses: (1) preemption; (2) scope of copyright protection; (3) no copyright infringement; (4) lack of registration; (5) failure to mitigate; (6) unclean hands; (7) lack of standing; (8) contributory negligence; (9) estoppel; (10) Bar-Z's own breach of the contract; and (11) unenforceability (Dkt. #66 at pp. 6–8).   App Star then filed counterclaims against Bar-Z, which included tortious interference, violations of the Digital Millenium Copyright Act under 17 U.S.C. § 512(f), violations of the Texas Uniform Trade Secrets Act and Federal Defend Trade Secrets Act, as well as requesting declaratory judgment (Dkt. #66 at pp. 10–15).  Bar-Z responded to the counterclaims by raising the affirmative defenses of privilege, estoppel and unclean hands, and justification (Dkt. #81 at pp. 5–7).

The nature of Bar-Z's arguments is that the undisputed evidence shows that there is no genuine issue of material fact that App Star and Patrick knowingly worked together to take the trade secrets that Patrick had acquired from Bar-Z and use it to their advantage.  Both App Star and Patrick did not respond to these claims, but the fact that neither defendant responded does not

go as far as Bar-Z would like it to go, arguing that "Rule 56(c) [m]andates [s]ummary [j]udgment [i]f [d]efendants [d]o [n]ot [r]espond" (Dkt. #143 at p. 12).  Bar-Z cites to the *Little v. Liquid Air Corp.* case for support of its argument.  37 F.3d 1069, 1075 (5th Cir. 1994) (en banc).  In *Little*, the Fifth Circuit urged that a court should not assume that the nonmoving party could or would prove the necessary facts in the absence of any proof.  However, judgment shall be rendered at the summary judgment stage only if all the evidence on file shows there is no genuine issue as to any material fact.  *Id.*  The case does not stand for the rule that the movant is absolved of its burden at the summary judgment stage just because there is no response.  The Court will treat Patrick and App Star's lack of a response to mean that the evidence is undisputed, but from there, it will conduct a standard summary judgment analysis.

Additionally, the Court recognizes that Patrick and App Star did not respond to the most recent amended complaint that Bar-Z filed.  Traditionally, when a party fails to raise an affirmative defense in the answer, the defense is waived*. See LSREF2 Baron, L.L.C. v. Tauch*, 751 F.3d 394, 398 (5th Cir. 2014) (citing *Morris v. Homco Int'l, Inc.*, 853 F.2d 337, 342–43 (5th Cir. 1988)).  However, Patrick and App Star responded to previous complaints and raised the affirmative defenses discussed above.  The Fifth Circuit is clear that it does not take a formalistic approach to determine whether an affirmative defense was waived.  *Pasco ex rel. Pasco v. Knoblauch*, 566 F.3d 572, 577 (5th Cir. 2009).[2]

Accordingly, the Court will now address each of the claims, counterclaims, and affirmative defenses that are mentioned above.

---

[2] Although the Court is not aware of any Fifth Circuit case law on the issue, the Court recognizes that some courts have held that when an amended complaint does not change the theory or scope of the case, a defendant does not waive its affirmative defenses by not filing an answer to that later complaint.  *See KST Data, Inc. v. DXC Tech. Co.*, 980 F.3d 709, 715 (9th Cir. 2020).  The Court does find that it is likely Patrick and App Star waived their affirmative defenses in this case, but because it would likely conclude that the amended complaints did not change the theory or scope of the case, it will conduct a full analysis as if the affirmative defenses were not waived.

I.      **Bar-Z's Claims against Patrick**

Bar-Z has raised several claims against Patrick, specifically, (1) trade secret misappropriation, (2) breach of contract, and (3) a breach of fiduciary duty.  As to the trade secret misappropriation, Bar-Z has alleged violations of both the Texas Uniform Trade Secret Act and the federal equivalent, the Federal Defend Trade Secrets Act.  The Court finds that Bar-Z satisfied its burden as to both the state and federal statutes.  The Court will address both in turn.

A.  **Texas Uniform Trade Secrets Act**

Under the Texas Uniform Trade Secrets Act, trade secrets misappropriation is established by proving three elements: "(a) a trade secret existed; (b) the trade secret was acquired through a breach of confidential relationship or discovered by improper means; and (c) use of the trade secret without authorization from the plaintiff." *Hoover Panel Sys., Inc. v. HAT Contract, Inc.*, 819 F. App'x 190, 198 (5th Cir. 2020) (citing *Wellogix, Inc. v. Accenture, L.L.P.*, 716 F.3d 867, 874 (5th Cir. 2013)).  Bar-Z must prove that no genuine issue of material fact exists for all three elements to show that it is entitled to relief for a violation of the Texas Uniform Trade Secrets Act at the summary judgment stage.

A trade secret is defined as "all forms and types of information, including business, scientific, technical, economic, or engineering information, and any formula, design, prototype, pattern, plan, complication, program device, program, code, device, method, technique, process, procedure, financial data, or list of actual or potential customers or suppliers . . ." *Giddy Holdings, Inc. v. Kim*, No. 1:20-CV-434, 2022 WL 1518925, at *6 (W.D. Tex. March 9, 2022) (citing TEX. PRAC. & REM. CODE § 134A.002(6)).  Bar-Z alleges that Patrick acquired several of its trade secrets and brought them to App Star.  These materials will be discussed in two groups.  First, there is Bar-Z's unique user interface ("UI") for its applications, which is the means by which a user interacts with the application and its specific design; the content management software

database ("CMS"), meaning the tool that allows for modifications of the applications; the application programming interface ("API"), meaning the application's ability to communicate with various third-parties; and the source code of the applications, which is the "human-readable program language" created by the programmer (collectively, the "Application Functionalities") (Dkt. #143 at p. 14).  The second group of alleged trade secrets include Bar-Z's "Sales Playbook," which is a group of materials including call scripts, email templates, pricing information, and marketing letters all compiled together to market their application to clients; as well as a sales pipeline list that included potential clients and certain information on those clients (collectively, "Marketing Materials") (Dkt. #143 at pp. 14, 18).

The decision of whether a trade secret existed is a question of fact that must be decided by a judge or jury as a factfinder.  *Wellogix*, 716 F.3d at 874.  In making the determination, courts will weigh six factors to determine if a trade secret exists:

> (1) the extent to which the information is known outside of his business; (2) the extent to which it is known by employees and others involved in his business; (3) the extent of the measures taken by him to guard the secrecy of the information; (4) the value of the information to him and to his competitors; (5) the amount of effort or money expended by him in developing the information; (6) the ease or difficulty with which the information could be properly acquired or duplicated by others.

*In re Bass*, 113 S.W.3d 735, 739–40 (Tex. 2003) (citing RESTATEMENT (FIRST) OF TORTS § 757 cmt. B (1939); RESTATEMENT (THIRD) OF UNFAIR COMPETITION § 39 reporter's n. cmt. d (1995)). Trade secrets have been found in a wide variety of cases in Texas, from a Taco Cabana's architectural plans and kitchen equipment layout to seismic data and its interpretations.  *Id.*; *Taco Cabana Intern. v. Two Pesos, Inc.*, 932 F.2d 1113, 1123, (5th Cir. 1991).  Generally, when money and time are invested in the development of a procedure or device that is made for a particular industry, and that certain procedure or device is not generally known, trade secret protection exists. *T-N-T Motorsports, Inc. v. Hennessey Motorsports, Inc.*, 965 S.W.2d 18, 22 (Tex. App.—Houston

[1st Dist.] 1998, pet. dism'd).  Additionally, when a business puts in effort to keep certain materials secretive, especially from competitors, the materials may be classified as trade secrets.  *See id.* Examples of these materials include customer lists, pricing information, marketing strategies, and client information.  *Id.*; *American Precision Vibrator Co. v. National Air Vibrator Co.*, 764 S.W.2d 274, 278 (Tex. App.—Houston [1st Dist.] 1988, no writ); *Murrco Agency, Inc. v. Ryan*, 800 S.W.2d 600, 604 (Tex. App.—Dallas 1990, no writ).

Here, the Court finds that all of Bar-Z's alleged trade secrets should be properly classified as trade secrets.  As for the Application Functionalities, the second, third, fourth, fifth, and sixth factors all rule in favor of Bar-Z.  As for the second and third factors, Little stated that every developer and employee that deals with any of its applications are required to sign a non-disclosure and confidentiality agreement (Dkt. #143, Exhibit 1 at p. 5).  The chambers of commerce that purchase these applications are also obligated not to disclose any Confidential Information (Dkt. #143, Exhibit 1 at pp. 5–6).  *See Metallurgical Industries Inc. v. Fourtek, Inc.*, 790 F.2d 1195, 1200 (5th Cir. 1986) (finding no surrender of secrecy where disclosures were not public announcements and secrets were only given to the businesses that plaintiff was expecting to receive a profit from).  Little also mentions that the Application Functionalities are restricted within the Bar-Z company itself, as specific log-in credentials are required to access the information (Dkt. #143, Exhibit 1 at p. 6).  One example of this restriction is that for the CMS database, only eight (8) employees may access this information (Dkt. #143, Exhibit 1 at p. 6).

The fourth factor discusses the value of the information.  These applications were relatively new and were specifically targeted at a niche market—chambers of commerce.  App Star coming in as a competitor and swooping in to address the need for a product that Bar-Z created surely classifies the information as "valuable" to both Bar-Z and its competitors.  Additionally, the fact

10

that Rice was adamant that App Star "need[ed] to duplicate the features" and his displeasure with the company's application developers because the applications they created were "supposed to be like the other apps that we sent," shows the importance of the Application Functionalities to Bar-Z's competitors (Dkt. #143, Exhibit 14 at p. 2; Dkt. #143, Exhibit 23, at p. 2).

As for the fifth factor, Bar-Z spent a great deal of time and money on these Application Functionalities, citing 175 total builds for the i0S version of the chamber applications and 61 total builds for the Android version (Dkt. #143, Exhibit 1 at p. 5). The cost for the developers on these applications also leans in Bar-Z's favor, as the amount spent exceeded $1.8 million (Dkt. #143, Exhibit 1 at p. 5).

As for the final factor, the fact that part of a design comes from the public domain does not necessarily disqualify it from becoming a trade secret. *See Imperial Chem. Indus. Ltd. v. Nat'l Distillers & Chem. Corp.*, 342 F.2d 737, 739 (2d Cir. 1965) (citing *Ferroline Corp. v. General Aniline & Film Corp.*, 207 F.2d 912, 921 (7th Cir. 1953)). Although the applications are in the public domain and can be easily duplicated in terms of their appearance, Bar-Z raises an argument regarding the relevant terms and conditions from the Apple App Store. When downloading one of Bar-Z's chamber applications, you are required to agree to a license that prohibits a user from downloading the application in order to "reverse engineer, disassemble, attempt to derive the source code of, modify, or create derivative works" of the application (Dkt. #143, Exhibit 30 at p. 9). As for the source code specifically, courts have treated this as a trade secret, despite the application's distribution to the public. *See Beardmore v. Jacobsen*, 131 F. Supp. 3d 656, 675 (S.D. Tex. 2015) (citing *Aspen Tech., Inc. v. M3 Tech., Inc.*, 569 Fed. App'x 259, 267–68 (5th Cir. 2014)).

A party proving that a trade secret exists "should not be required to satisfy all six factors because trade secrets do not fit neatly into each factor every time." *Tewari De-OX Systems, Inc. v. Mountain States/Rosen, L.L.C.*, 637 F.3d 604, 611 (5th Cir. 2011).   Therefore, the Court finds that the Application Functionalities qualify as trade secrets.

As for the Marketing Materials, the Court comes to the same conclusion.  Bar-Z intended to make money on these chamber of commerce applications based on an economic model using advertisement revenue.  After Bar-Z agreed on this model, the marketing team was tasked with creating materials to reach out to advertisers and creating documents that can be distributed to clients as sort of a template.  The marketing team spent years creating these Marketing Materials and editing them to get to the final version that exists today (Dkt. #143, Exhibit 1 at p. 6). Competitors can save time and money with access to this information.  The same is true regarding the list of potential customers.  *See Alliantgroup, L.P v. Feingold*, 803 F. Supp. 2d 610, 625 (S.D. Tex. 2011) (discussing the analysis for whether a customer list may be protected as a trade secret). One of the potential customers identified on Bar-Z's pipeline list ultimately became a client with App Star after Patrick left, meaning App Star was able to gain clientele and circumvent the resources that Bar-Z used because of the information that Patrick provided to them (Dkt. #143 at p. 7).  Texas courts have treated materials similar to the Marketing Materials as trade secrets, if there is a component of secrecy.  *See Rugen v. Interactive Bus. Sys., Inc.*, 864 S.W.2d 548, 552 (Tex. App.—Dallas 1993, no writ) (pricing information); *Miller Paper Co. v. Roberts Paper Co.*, 901 S.W.2d 593, 601–02 (Tex. App.—Amarillo 1995, no writ) (classifying "the book" that included former customer names and information about those customers as a trade secret); *Bertotti v. C.E. Shepherd Co., Inc.*, 752 S.W.2d 648, 654 (Tex. App.—Houston [14th Dist.] 1988, no writ) (marketing strategies, pricing, and customer lists).  The Court finds that because Bar-Z took steps

to ensure the Marketing Materials were not shared outside of the company, the secrecy component is met, and the Court finds that the Marketing Materials are valid trade secrets.

The Court finds that both categories of information, the Marketing Materials and Application Functionalities, were properly protected from competitors to avoid a situation like the exact one that occurred here.  As a result, the Court finds that based on the relevant factors and the applicable law, Bar-Z has conclusively established that a trade secret existed in this case.

The next question is whether the trade secrets were acquired through a breach of confidential relationship or discovered by improper means**.**  The Court will first address whether this second element is satisfied with the Marketing Materials.  Bar-Z has provided ample evidence to show this element has been conclusively established.  A confidential relationship existed between Bar-Z and Patrick, which is shown through the multiple agreements signed by Patrick that prohibited Patrick from sharing Bar-Z's confidential information.  App Star acquired Bar-Z's Marketing Materials, as evidenced by the phone script that Bar-Z used for its Passport 2 Midland application found on Rice's cell phone (Dkt. #143 at p. 10; Dkt #143, Exhibit 6) and the almost identical marketing letter that App Star used compared to the one that Bar-Z used (*compare* Dkt. #143, Exhibit 19 *with* Dkt. #143, Exhibit 1 at p. 22–23).  Bar-Z has provided evidence that shows Patrick had worked on the call script and marketing letter while he was at Bar-Z and that he texted Rice saying that he sent "Trish the marketing letter and the script for Princeton" (Dkt. #143, Exhibit 20 at p. 2).  This comes months after Rice asked Patrick if he was able to get "that box" from Patrick's car that had "any of the things that [he] was looking for that [he] thought [was] on [his] computer" (Dkt. #143, Exhibit 3 at p. 2).  Additionally, Bar-Z kept its pricing information on a trifold that detailed all of Bar-Z's flexible sizes and available packages.  This fact provides necessary context for another text message to Rice from Patrick saying, "I found the trifold," which

was ultimately given to Rice (Dkt. #143, Exhibit 7 at p. 2).  Finally, Patrick was actively involved in creating the pipeline list and deciding who would be qualified to be on Bar-Z's official list (Dkt. #143, Exhibit 1 at p. 6).  One of those chambers, Colleyville Chambers, ended up working with App Star after Patrick made the transition.  All in all, the Marketing Materials were acquired and in the possession of App Star, and the evidence shows that this was done through means that were explicitly prohibited of Patrick in his contracts with Bar-Z.  The second element is conclusively established for the Marketing Materials.

The second element for the Application Functionalities is more difficult to prove, given the lack of physical items like the Marketing Materials.  However, Bar-Z has shown that the UI of Bar-Z's applications satisfies the second element.  The applications that Bar-Z created and the ones that App Star ultimately released are almost identical in design (Dkt. #66 at p. 11). Additionally, the fact that one of App Star's applications has the name of one of the functionalities that Bar-Z used as a link, specifically "Grangbury [sic] Chamber of Commerce" and "City of Granbury" on an application for the city of Princeton only further proves that App Star acquired Bar-Z's trade secrets (Dkt. #151, Exhibit 2 at p. 96).  How App Star acquired this information is key.  Patrick drew the initial layout of the applications that Bar-Z used on a piece of paper for Rice, and time and time again Rice told developers that the layout of the applications they were creating were not close enough to the "other applications" (Dkt. #143, Exhibit 10).  This is evidence that App Star acquired the information through the breach of the confidential relationship between Bar-Z and Patrick.  There is additional evidence that App Star's developer received Bar-Z's trade secrets by downloading the applications from the Apple App Store, when a customer is expressly prohibited from downloading the application for that sole reason.  This is evidence that App Star acquired the information through improper means.  Both the use of improper means and through

14

a breach of confidential relationship are independent reasons that prove that App Star received the information about Bar-Z's UI through expressly prohibited channels.  Bar-Z has shown that there is no genuine issue of material fact as to its UI being misappropriated.

The rest of the Application Functionalities are even more difficult to prove without expert testimony presented before the Court.  The difference in these other features is that there is not clear evidence that App Star had access to all the resources that Bar-Z alleges that it did.  For example, there is no evidence on the record that indicates to the Court that App Star's applications uses the same CMS or API that Bar-Z's applications use.  The way that an App Star application is modified is evidence that is currently not on the record.  The same is true regarding how the applications communicate with third-party applications.  Based on the evidence that is before the Court it cannot be said that the App Star acquired this information.  While it may be true that the use of reverse engineering could potentially allow for App Star to possess Bar-Z's original CMS or API, that is a fact question that cannot be decided at this point in the proceedings.  *See Pepper v. Int'l Gaming Sys., LLC*, 312 F. Supp. 2d 853, 862 (N.D. Miss. 2004) ("[P]laintiff's failure to present an expert would preclude him from the ability to establish that his software in the circumstances was . . . [subject to] reverse engineering.")   As for the UI, the Court has conclusively established that the second element is satisfied.  However, the same is not true for the remaining Application Functionalities.

The final element that Bar-Z must show is that App Star did not have authorization to use Bar-Z's trade secrets.  *Wellogix*, 716 F.3d at 874.  Nothing in the record indicates that App Star requested Bar-Z's permission to use its trade secrets.  The evidence is quite the contrary, as Little contacted both Patrick and Rice when he became aware that they may be using Bar-Z's trade secrets and reminded them of the agreements that Patrick had signed.  Although Rice was more

than explicit to Patrick and App Star's developers that App Star was "building a copy of the other app," there has been no evidence introduced to give rise to the premise that they were properly authorized to do so (Dkt. #143, Exhibit 18 at p. 2).  No genuine issue of material fact exists for the third and final element.

In sum, Bar-Z had satisfied its burden and shown that App Star has misappropriated its trade secrets, specifically the Marketing Materials and the UI of the applications.

### B.  Federal Defend Trade Secrets Act

The Federal Defend Trade Secrets Act ("DTSA") is not much different than the Texas equivalent, as the federal claim for misappropriation has three elements: (1) a trade secret; (2) misappropriation; and (3) use in interstate commerce.  *See Mallet and Co. v. Lacayo*, 16 F. 4th 364, 380 (3d Cit. 2021); *Blue Star Press, LLC v. Blasko*, No. SA-17-111, 2018 WL 1904835, at *2 (W.D. Tex. Mar. 6, 2018).  "A person misappropriates a trade secret when the person uses improper means to acquire knowledge of a trade secret and then discloses or uses a trade secret without consent." *ESPOT, Inc. v. MyVue Media, LLC*, 492 F. Supp. 3d 672, 698 (E.D. Tex. 2020) (citing 18 U.S.C. § 1839(5)(B)(i)).  The first two elements will not be re-evaluated by this Court, as the Court has already found that Bar-Z has conclusively shown that it had trade secrets in this case and that Patrick misappropriated them.

The only factor that remains is the use in interstate commerce.  The court in *Providence Title Co. v. Truly Title, Inc.* discussed this point in depth.  547 F. Supp. 3d 585, 596–98 (E.D. Tex. 2021).  Because of the statute's language, Bar-Z must prove that the trade secrets relate to a product or service that is used in or intended to use in interstate commerce, which is more than showing the activity merely affects interstate commerce.  *Id.* at 597.  In *Providence Title*, the court found that the "used in commerce" requirement was satisfied because the trade secrets were used to manage the business of title services, and those title services were provided "to out-of-state

purchasers of Texas properties and work[ed] with out-of-state underwriters on Texas title insurance policies." *Id.* at 598; *see also Complete Logistical Servs., LLC v. Rulh*, 350 F. Supp. 3d 512, 520 (E.D. La. 2018) (finding that the interstate commerce element of the DTSA is satisfied because regardless that the defendant is headquartered in Louisiana, the defendant transacts business in other states in person, by phone, internet, and mail).

Here, the "used in commerce" element is easily satisfied.  Bar-Z's trade secrets were all related to the chamber of commerce applications that were available on the Apple App Store and Google Play, meaning they were accessible to the entire public, not just Texas or Louisiana residents.  Additionally, while the applications only covered information about the client's own city in Texas or Louisiana, the applications were intended for both in-town residents as well as out-of-state visitors who could "check out chamber member businesses on the app" (Dkt. #143 at p. 6).  The Court finds that there is no genuine issue of material fact that the "used in commerce" element of the DTSA is satisfied, meaning that Bar-Z has met its burden at the summary judgment level for its DTSA claim.  The Court will now address Bar-Z's breach of contract claim.

### C.  Breach of the Employment Agreement

Bar-Z next moves for summary judgment on its breach of the Employment Agreement. Bar-Z alleges that Patrick violates two separate sections of the Employment Agreement.  For a party to prevail on a breach of contract claim under Texas law, it must show that there is: (1) a valid contract; (2) performance or tendered performance by the plaintiff; (3) breach of the contract by the defendant; and (4) damages to the plaintiff as a result of the defendant's breach.  *Williams v. Wells Fargo Bank, N.A.*, 884 F.3d 239, 244 (5th Cir. 2018).  The two sections that Bar-Z contend were breached are the non-compete provision and the non-disclosure of confidential information. The Court will address each of the alleged violations separately.

### 1.   Non-Compete Provision

Despite Rice's belief that "non-compete agreements are not enforceable in Texas," Texas law has generally accepted non-compete provisions in employment agreements, so long as the provision is ancillary to an otherwise enforceable agreement and the restrictions are reasonable in scope.  *See Drummond Am., LLC v. Share Corp.*, 692 F. Supp. 2d 650, 654 (E.D. Tex. 2010); *see also* TEX. BUS. & COM. CODE § 15.50(a).  Here, the relevant provision states the following:

> Noncompetition.  To the extent permitted by law, I agree that for a period of twelve (12) months immediately following the termination of my relationship with the Company for any reason, whether with or without cause, I shall not either directly or indirectly engage in (whether as an employee, consultant, proprietor, partner, director or otherwise), or have any ownership interest in, or participate in the financing, operation, management or control of, any person, firm, corporation or business that engages in or proposes to engage in a business competitive with any business in which the Company was engaged during the term of my employment or in which, during the term of my employment, the Company proposed to later become engaged. The scope of the covenant set forth in this section shall be worldwide.  I acknowledge that the Company's technology and products have worldwide application, including without limitation over the Internet and that such scope is reasonable. It is agreed that ownership of no more than 2% of the outstanding voting stock of a publicly traded corporation shall not constitute a violation of this provision.

(Dkt. #143, Exhibit 1 at pp. 9–10).  The non-compete provision was merely one clause in the five-page Employment Agreement between the parties.  There is no evidence on the record regarding why the Employment Agreement as a whole would not be enforceable.  Therefore, the first requirement of an otherwise enforceable agreement is satisfied.  As for the restrictions, a twelve-month restriction on trade has been determined reasonable by Texas courts.  *Am. Exp. Financial Advisors, Inc. v. Scott*, 955 F. Supp. 688, 692–93 (N.D. Tex. Nov. 18, 1996).  Additionally, although the geographic restriction was worldwide, again, the Court points out that the work that Patrick did while at Bar-Z concerned a very specific market.  *See AmeriPath, Inc. v. Hebert*, 447 S.W.3d 319, 335 (Tex. App.—Dallas 2014, pet. denied) ("[T]he breadth of enforceable geographical restrictions in covenants not to compete must depend on the nature and extent of the

employer's business and the degree of the employee's involvement in that business."). Even with this geographical restriction, it is unlikely that Patrick will be greatly restrained from finding employment. The Court agrees with Bar-Z that the restraints in the non-compete provision are reasonable. Both the Employment Agreement and the non-compete provisions are valid promises and because Patrick signed this agreement and acknowledged his obligation again in his termination agreement, the Court finds that the first element on the breach of contract action is satisfied (Dkt. #143, Exhibit 1 at pp. 9–13, 39–40).

For the element of performance, Patrick signed the Employment Agreement on April 3, 2017, and it was in effect on September 26, 2018, when Patrick was terminated for cause (Dkt. #143, Exhibit 1 at p. 39). Upon termination, Patrick signed another agreement that acknowledged his obligation under the non-compete (Dkt. #143, Exhibit 1 at pp. 39–40). The Court again points out that Patrick did not respond to the pending motion. Therefore, there is nothing on the record indicating that there was a lack of performance from Bar-Z that would invalidate the agreement during the employment relationship while it existed. Additionally, there is nothing to indicate that the survivorship language in the non-compete was suspended at any point.

As to breach, the Court finds that Bar-Z has established that a breach occurred in this case. From the conversations Patrick and Rice separately had with Little, the text messages between Patrick and Rice which include the drawing of the architecture of the applications, and the finding of Bar-Z materials on Rice's phone, it is no question that Patrick provided Bar-Z's trade secrets to a competitor. The question that follows is regarding the timeline of when Patrick was fired to when App Star would have received this information. Although the record does not provide an exact date for when Rice first acquired these trade secrets from Patrick, the Court can come to a conclusion that it was within that twelve-month period that Patrick was explicitly prohibited from

working with one of Bar-Z's competitors.  This is because of the conversations between Patrick and Rice that all occurred within that twelve-month window, and App Star's subsequent conversations with Colleyville Chamber of Commerce, one of Bar-Z's potential clients on its client list, which also began during that twelve-month period.  In fact, the specific text messages from Rice asking Patrick if he found "the box" in his car was sent less than a month after Patrick's position at Bar-Z was terminated (Dkt. #143, Exhibit 3 at p. 2).  Patrick provided no evidence to the contrary.  Bar-Z has shown that a breach of this provision occurred during the relevant period.

The element of damages is also satisfied here.  In cases involving trade secrets, a company suffers great harm when a competitor acquires access to its confidential information and possible loses customers as a result.  *See TransPerfect Translations, Inc. v. Leslie*, 594 F. Supp. 2d 742, 757 (S.D. Tex. 2009); *PepsiCo, Inc. v. Redmond*, 54 F.3d 1262, 1270 (7th Cir. 1995).  Here, Bar-Z lost clients because another company copied its ideas and profited from it.  There is no genuine issue of material fact here, Bar-Z suffered damages because Patrick breached the employment agreement that he had with Bar-Z.

### 2.  Breach of Confidentiality

The second provision of the agreements between the parties that Bar-Z alleges was breached is that non-disclosure of confidential information, which prohibits the disclosure of certain company information and mandates that the employee will not keep any company documents after termination.[3]  The Marketing Materials and the UI of the application would be

---

[3] There are two relevant provisions that Bar-Z mentions in its briefing regarding the breach of confidentiality.  The first section in the Employment Agreement, states the following:

Company Information.  I agree at all times during the term of my employment and thereafter, to hold in strictest confidence, and to not use, except for the benefit of the Company, or to disclose to any person, firm or corporation without written authorization of the Board of Directors of the Company, any Confidential Information of the Company.  I understand that "Confidential Information" means any company proprietary information, technical data, trade secrets or know-how, including, but not limited to, research, product plans, products, services, customer lists and customers (including, but not limited to, customers of the Company on whom I called or with whom I became

encompassed in the provision of the Employment Agreement.  As already mentioned, the Court finds that the Employment Agreement is a valid contract and performance by Bar-Z was completed.  Unlike non-compete provisions, there is not an exact test that the Court can apply on interpreting confidentiality provisions or a return document obligation.  Rather, the Court will look at the language that Patrick signed and agreed to and see if those provisions were violated by Patrick.  Nothing on the record indicates that the confidentiality or return documents provisions should not be interpreted as part of the contract between the parties.

Courts must enforce unambiguous contracts as written.  *In re Davenport*, 522 S.W.3d 452, 457 (Tex. 2017).  Here, the evidence establishes that both sections are unambiguous and both sections were violated by Patrick.  Starting with the company information provision, Patrick gave App Star the unique design of the application, the names of certain competitors to reach out to, and the Marketing Materials he had.  As for those Marketing Materials, the pricing trifold, the marketing letters, and call scripts all would be encompassed in the Return Documents provision. The harm suffered here is the same as the one suffered because of the violation of the non-compete provision.  Rice and App Star benefitted from Patrick's violations, and as a result, Bar-Z suffered in potential revenue and clientele.  Bar-Z has conclusively proven that Patrick breached multiple provisions of the employment agreement that he had with Bar-Z.

---

acquainted during the term of my employment), markets, software, developments, inventions, processes, formulas, technology, designs, drawings, engineering, hardware configuration information, marketing, finances or other business information disclosed to me by the Company either directly or indirectly in writing, orally or by drawings or observation of parts or equipment.

The second relevant section is triggered after Patrick's employment ended, stating:

Returning Company Documents.  I agree that, at the time of leaving the employ of the Company, I will deliver to the Company (and will not keep in my possession, recreate or deliver to anyone else) any and all software, devices, records, data, notes, reports, proposals, lists, correspondence, specifications, drawings, blueprints, sketches, materials, equipment, other documents or property, or reproductions of any aforementioned items developed me pursuant to my employment with the Company or otherwise belonging to the Company, its successors or assigns.

### D.  Breach of Fiduciary Duty

To show a breach of fiduciary duty, the moving party must show the following three elements: (1) a fiduciary relationship between the plaintiff and defendant; (2) the defendant breached his fiduciary duty to the plaintiff; and (3) the defendant's breach results injury to the plaintiff or benefit to the defendant.  *Navigant Consulting, Inc. v. Wilkinson*, 508 F.3d 277, 283 (5th Cir. 2007).

The Court will start on deciding whether the evidence is clear to show there was a fiduciary relationship between Bar-Z and Patrick.  In defining what a fiduciary relationship entails, the Texas Supreme Court has been clear that there is no single "definition of the term fiduciary that is comprehensive enough to cover all cases." *Id.* (citing *Johnson v. Brewer & Pritchard, P.C.*, 73 S.W.3d 193, 199 (Tex. 2002)).  The term refers to integrity and fidelity, and contemplates fair dealing and good faith, rather than legal obligation, as the basis of the transaction.  *Kinzbach Tool Co. v. Corbett-Wallace Corp.*, 160 S.W.2d 509, 513 (Tex. 1942).  When dealing with an employer-employee relationship, Texas does not traditionally impose fiduciary duties on employees.  *Merritt Hawkins & Assoc., LLC v. Gresham*, 79 F. Supp. 3d 625, 637 (N.D. Tex. 2015).  However, an informal fiduciary relationship may arise between the employee and employer when there is some component of trust or reliance upon one another.  *Navigant Consulting*, 508 F.3d at 283 (fiduciary relationship existed because employees enjoyed broad discretion over certain aspects of the job); *Molex, Inc. v. Nolen*, 759 F.2d 474, 479 (5th Cir. 1985) (fiduciary relationship existed because employer "obviously trusted" sales representative that oversaw an account and dealt with that client).

In this case, a fiduciary duty existed between the parties.  After Bar-Z decided that it was going to create applications directly targeted at chambers of commerce, Patrick was trusted with Bar-Z's trade secrets because he contributed to those trade secrets and creating the final products.

Patrick edited the marketing letters and call script, he helped create the pipeline list, he was given access to information that other employees at Bar-Z were not.  The evidence conclusively establishes that a fiduciary relationship existed between the two parties because there was trust and reliance between Bar-Z and Patrick.  While fiduciary duties generally terminate at the time the employment relationship ceases, an employee is still prohibited from appropriating his employer's trade secrets or carrying away that information. *Merritt Hawkins*, 79 F. Supp. 3d at 637.  This obligation is not indefinite. *See id.* (discussing that there was two years since the employment relationship had terminated and that was a factor in favor of no fiduciary relationship).  Here, Patrick had a fiduciary duty to not disclose Bar-Z's trade secrets and not enough time has passed to conclude that Patrick was no longer obligated to his fiduciary duty.  Patrick's disclosure of Bar-Z's trade secrets occurred less than a year after his employment terminated.  And as already discussed, Bar-Z suffered harm as a result of these disclosures by Patrick.  Therefore, Bar-Z has conclusively established that Patrick breached his fiduciary duty with Bar-Z.

Although Bar-Z has proven all four of its claims against Patrick at the summary judgment stage, the Court will look at Patrick's affirmative defenses that he raised.  If Patrick raises a valid affirmative defense against Bar-Z, then a genuine issue of material fact still exists and Bar-Z may only be entitled to partial summary judgment. *See Weatherly v. Pershing, LLC*, 322 F. Supp. 3d 746, 748 (N.D. Tex. 2018).

### E.  Patrick's Affirmative Defenses

In its answer to Bar-Z's Third Amended Complaint, Patrick raised twelve affirmative defenses against Bar-Z's claims (Dkt. #68 at pp. 7–9).  However, Patrick only puts a single conclusory sentence for each listed defense.  While the Court will address each defense listed, it will only conduct an analysis on the defenses that it has sufficient information to address.

23

The first defense raised by Patrick, preemption, argues that the state law claims asserted by Bar-Z are preempted by the Copyright Act (Dkt. #68 at p. 7).  The Copyright Act preempts certain state law claims that fall within the general scope of federal copyright law, regardless of whether the works are actually afforded protection under the Copyright Act.  *Ultraflo Corp. v. Pelican Tank Parts, Inc.*, 845 F.3d 652, 655–56 (5th Cir. 2017); *see* 17 U.S.C. § 301.  However, courts have found that under Texas law, trade secret misappropriation is not preempted by the Copyright Act.  *M-I LLC v. Stelly*, 733 F. Supp. 2d 759, 785–86 (S.D. Tex. 2010); *GlobeRanger Corp. v. Software AG U.S. of Am., Inc.*, 836 F.3d 477, 486 (5th Cir. 2016); *Computer Assocs. Intern., Inc.*, 982 F.2d 693, 720–721 (2d Cir. 1992) (involving Texas law).  This is because for trade secret misappropriation, there is an additional element required—a breach of confidential relationship or discovery by improper means—which "regulates conduct qualitatively different from that regulated by federal copyright law."  *M-I LLC*, 733 F. Supp. 2d at 785 (quoting *DSC Commc'ns Corp. v. Pulse Commc'ns, Inc.*, 170 F.3d 1354, 1365 (4th Cir. 1999)); *see also GlobeRanger Corp.*, 836 F.3d at 486 ("Because trade secret law protects against not just copying but also any taking that occurs through breach of a confidential relationship or other improper means, all ten circuits that have considered trade secret misappropriation claims have found them not preempted by the Copyright Act.").  The Court agrees with this analysis and finds that preemption is not at play here for Bar-Z's state law claims for misappropriations of trade secrets.  Any argument regarding preemption would not apply to any of Bar-Z's remaining cause of actions, as it does not displace federal law and it would not have any bearing on the breach of contract or breach of fiduciary duty claims.  17 U.S.C. § 301(a); *Recursion Software, Inc. v. Interactive Intelligence, Inc.*, 425 F. Supp. 2d 756, 766 (N.D. Tex. 2006) (discussing the case law in this circuit that has routinely found that a legitimate breach of contract claim defeats preemption); *Daboub v. Gibbons*, 42 F.3d 285, 289–

24

90 (5th Cir. 1995) (alleging a breach of fiduciary duty renders a party's claims different in kind from copyright infringement for the purposes of a preemption analysis).

The second defense simply states that: "Bar-Z's claims are barred in whole or in part because the allegedly infringed works are not subject to protection under the Copyright Act" (Dkt. #68 at p. 7).  The third defense refers to a number of defenses that are only available in copyright cases.  The fourth defense argues that Bar-Z's claims are barred because "it has not registered its copyright claims with the United States Copyright Office" (Dkt. #68 at p. 7).  None of Bar-Z's claims stem from the Copyright Act and therefore, the Court finds that the second, third, and fourth defenses do not apply in this case.

As for Patrick's fifth, sixth, eighth, and ninth defense, the Court does not have enough details to conduct a thorough analysis on any of those defenses.  Patrick provides no argument to support either of those claims and "it is not the Court's duty to make the parties' arguments for them." *Meier v. UHS of Del, Inc.*, No. 4:18-CV-00615, 2019 WL 6465314, at *8 (E.D. Tex. Dec. 2, 2019); *see also Mendoza v. A&A Landscape & Irrigation, LP*, No. 4:12-CV-562, 2013 WL 12403556, at *2 (E.D. Tex. Nov. 26, 2013) ("It is not the obligation of the Court to make arguments on [the parties'] behalf, and find legal precedent to support those arguments, especially in light of the fact that [the parties] had ample time to brief the Court.").  The Court is lacking facts how Bar-Z failed to mitigate its damages, how the doctrine of unclean hands applies, how contributory negligence is a viable affirmative defense given there is no negligence cause of action, or how the doctrine of estoppel applies.  Because Patrick failed to provide further analysis on how these defenses applied in this case, the Court finds that the fifth, sixth, eight, and ninth defenses do not apply here and will grant summary judgment on these defenses in favor of Bar-Z.

The seventh defense raised by Patrick was that Bar-Z lacks standing in this case (Dkt. #68 at p. 8).  The Court concludes that Bar-Z has proper standing in this case for all its claims.  To establish standing, the plaintiff must have "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Denning v. Bond Pharmacy, Inc.*, 50 F.4th 445, 450 (5th Cir. 2022) (citing *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016)).  To establish injury in fact, a plaintiff must show that he or she suffered "an invasion of a legally protected interest" that is "concrete and particularized" and "actual or imminent, not conjectural or hypothetical." *Spokeo*, 578 U.S. at 339 (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)).  Traditional and recent precedent arising from both the Fifth Circuit and the Supreme Court reflect that a breach of contract is a sufficient injury for standing purposes.  *Denning*, 50 F.4th at 451.  The Court does not see an issue with Bar-Z's other claims as well, as all of Bar-Z's claims center around the idea that information that it sought to protect and keep within the company was given to a competitor.  As already mentioned, Patrick had an obligation not to disclose Bar-Z's trade secrets, but when App Star asked him to provide these secrets, Patrick chose to comply.  The injury in fact element should be satisfied for each of Bar-Z's claims.  The second element is also satisfied because Patrick was a previous employee of Bar-Z and started working for App Star less than a year after his position was terminated.   The mere coincidence alone that App Star came into possession of this information during that time should be enough to constitute traceability, but even if it was not, the text messages between Patrick and Rice are more than enough to satisfy this element.  The final element to show standing is redressability.  Here, Bar-Z's cause of actions entitle them to both legal and equitable relief, satisfying this final element.  Patrick argues that because the copyright owners of the applications are not Bar-Z, they cannot "enforce its alleged copyrights" (Dkt. #68 at

p. 11).  Again, Bar-Z is suing because of the trade secrets that were elicited by Patrick when they were protected by the Employment Agreement that Bar-Z had with Patrick.  The Court finds that Bar-Z has standing on all its claims and therefore, Patrick's seventh defense will be dismissed.

The tenth defense that Patrick raises is a competing breach of contract claim.  Specifically, Patrick argues that because Bar-Z breached its contract with Patrick in delaying payment, it cannot recover on its own breach of contract action.  In a breach of contract action, one of the required elements is "performance."  This means that if a party has not properly performed its obligations under the contract, then it cannot raise a breach of contract action on its own.  Additionally, when a party to the contract commits a material breach of that contract, the other party is discharged or excused from any obligation to perform.  *Trumble Steel Erectors, Inc. v. Moss*, 304 F. App'x 236, 239 (5th Cir. 2008) (citing *Hernandez v. Gulf Group Lloyds*, 875 S.W.2d 691, 692 (Tex. 1994)).  In this case, Patrick materially breached the contract that it had with Bar-Z when it violated the provisions discussed above.  As a result, Patrick's breach of contract defense will not impact Bar-Z's ability to recover under its breach of contract action.

Patrick asserts that the parties are subject to mandatory arbitration in its eleventh defense.  In the Employment Agreement between the parties, there is an arbitration clause, stating that "any dispute or controversy arising out of or relating to any" breach of the Employment Agreement "shall be settled by arbitration to be held in Travis County" (Dkt. #143, Exhibit 1 at p. 12).  However, after analyzing the language of the Employment Agreement, that provision is not applicable in this scenario.  The arbitration clause begins with a carve-out, stating "except as provided below," referring to the section titled "Equitable Remedies."  In that provision, the Employment Agreement states, in relevant part:

> Accordingly, I agree that if I breach any of such covenants [set forth herein], the Company [Bar-Z] will have available, in addition to any other right or remedy

available, the right to obtain an injunction from a court of competent jurisdiction restraining such breach or threatened breach and to specific performance of any such provision of this Agreement.

(Dkt. #143, Exhibit 1 at p. 12).  Here, Bar-Z is raising claims that all arise out of Patrick's violations of the covenants listed in the Employment Agreement.  These are the exact types of disputes that are excluded from the mandatory arbitration provision, as they will be decided by "a court of competent jurisdiction."  Accordingly, Patrick's eleventh affirmative defense will dismissed.

The twelfth defense raised by Patrick is that Patrick's obligations under the contract were unenforceable and unconscionable.  As discussed already, the non-compete provision, the confidentiality provision, and the obligation to return materials are all enforceable provisions of the contract.  There are no unreasonable restraints on trade or any outrageous covenants in the Employment Agreement.  In fact, most of these provisions are standard in this type of employment.  As to the unconscionability portion, no facts are currently on the record regarding the surrounding circumstances of the contract.  Patrick has not given enough facts to make this argument, other than a conclusory statement that the obligations were unconscionable.  Because Patrick provides no argument or facts that would allow this Court to believe that it would arise in this case, the Court finds that this twelfth and final affirmative defense does not apply.

In sum, Patrick did not respond to the pending motion, and Bar-Z has satisfied its burden on all its original claims against Patrick.  As to Patrick's affirmative defenses, each listed defense either does not apply in this case or has no bearing on Bar-Z's ability to recover in this action. Summary judgment will be granted in favor of Bar-Z as to all of Patrick's affirmative defenses.

## II.   Patrick's Counterclaims

Patrick raised four counterclaims against Bar-Z in its answer (Dkt. #68).  The Court will not conduct another analysis on the alleged breach of contract counterclaim, because the argument is no different than what was raised in the breach of contract "affirmative defense."  The Court

28

will address the remaining three claims: (1) trade secret misappropriation; (2) defamation; and (3) declaratory judgment.

Under the Texas Uniform Trade Secrets Act and DTSA, a party being sued is eligible to receive attorneys' fees, if it was found that the claims made are in bad faith.  TEX. CIV. PRAC. & REM. § 134A.005; 18 U.S.C. § 1836(b)(3)(D).  However, the Court finds that there is no bad faith claim made on behalf of Bar-Z.  In fact, because Bar-Z has shown that there is no genuine issue of material fact for its Texas Uniform Trade Secrets Act and DTSA claim, it will dismiss Patrick's counterclaim alleging that they were simply made in bad faith.

Patrick alleges that "Bar-Z published false statements of fact that defamed Patrick" (Dkt. #68 at p. 13).  The specific statements that Patrick alleges are a problem are that Patrick misappropriated Bar-Z's trade secrets.  However, the Court will reiterate what it stated with Patrick's Texas Uniform Trade Secrets Act and DTSA claims.  Because the Court has found that Bar-Z has shown no genuine issue of material fact that its trade secrets were misappropriated by Patrick, the statements made were not false.  In fact, one of the problems that Patrick raises is the fact that Melinda Little—co-founder of Bar-Z with Little—filed an official complaint with the Apple App Store and Google Play in order for them to remove App Star's applications.  Again, although those statements made by Bar-Z employees likely did harm Patrick's reputation, it in no way can be considered defamation if the statements made were true.  Here, the Court finds that the statements were true, and therefore, no defamation cause of action can be pursued.  Patrick's defamation claim will be dismissed.

The final counterclaim that Patrick makes is for a request of declaratory relief, specifically asking for a declaration that no copyright infringement occurred in this case.  The Court finds that this is not necessary.  As already discussed in this Order, none of the causes of action alleged by

Bar-Z are under the Copyright Act.  Additionally, just because the materials at issue are not protected by copyright does not mean that Bar-Z has no claim.  The materials at issue were trade secrets and Patrick had an obligation not to disclose those trade secrets, especially not with a direct competitor of Bar-Z.  As a result, the requested relief of a declaratory judgment will not be granted, and the claim will be dismissed.

All of Patrick's counterclaims have been dismissed.  Accordingly, the Court need not address any of Bar-Z's affirmative defenses to Patrick's counterclaims.  The Court will now move to discuss Bar-Z's claims against the other remaining Defendant, App Star.

### III.    Bar-Z's Claims against App Star

Bar-Z has three outstanding claims that it seeks summary judgment for against App Star.  First, Bar-Z is alleging that App Star is also at fault for the misappropriation of trade secrets under the Texas Uniform Trade Secrets Act and DTSA.  Additionally, Bar-Z alleges that App Star tortiously interfered with Patrick's employment agreement with Bar-Z.  Finally, Bar-Z alleges that App Star is a joint tortfeasor for Patrick's breach of fiduciary duty.  The Court will address each of these claims in turn.

#### A.  Misappropriation of Trade Secrets

Starting with the misappropriation of trade secrets, the Court has previously found that the majority of the materials at issue are properly classified as trade secrets.  The next required element is that these trade secrets were acquired by App Star by improper means or by a breach of confidential relationship.  For Patrick, the Court focused more on the fact that Patrick gave the information to App Star that the company used to its advantage.  However, here, the Court will look more at the fact that App Star continuously asked Patrick to retrieve the materials that he still had from Bar-Z and the steps that the company took to ensure that its applications mirrored the applications that Bar-Z were producing for chambers of commerce.  The conversations that Rice

had with App Star's developer are relevant here.  Specifically, the idea that the developers were not making the applications "close enough" in appearance to what he wanted was a problem for Rice and then, the developer downloaded the Bar-Z applications for the mere purpose of reverse engineering when the application's terms and conditions explicitly prohibit that conduct.  If there was any doubt that App Star did not use improper means in this case, the conversation that took place between Little and Rice highlights the bad conduct on behalf of App Star.  When Rice tells Little over the phone: "What are you going to do about it?" after being informed what they are doing was wrong from Little, the Court is convinced the analysis ends here.  The final required element that Bar-Z must show for the Texas Uniform Trade Secrets Act, is that the use of the trade secret is without authorization from the plaintiff.  The Court again points to the conversation that took place between Rice and Little.  Additionally, there is no evidence on the record to contrast Bar-Z's claim that App Star did this without conferring with Bar-Z.  The final element for the DTSA, requires that App Star used the trade secrets in interstate commerce.  App Star used Bar-Z's trade secrets for applications that were released for the general public.  Anyone could download these applications on Google Play or the Apple App Store.  This satisfies the interstate commerce requirement.  As a result, the Court finds that Bar-Z will be granted summary judgment on its misappropriation of trade secrets claim against App Star.

### B.  Tortious Interference

As for the tortious interference claim, Bar-Z claims that App Star interfered with the Employment Agreement, specifically the provisions that were still active after Patrick's position was terminated.  In order to prevail on this claim of tortious interference with a contract, Bar-Z must prove "(1) that a contract subject to interference exists; (2) that the alleged act of interference was willful and intentional; (3) that the willful and intentional act proximately caused damage; and (4) that actual damage or loss occurred."  *Amigo Broad., LP v. Spanish Broad. Sys., Inc.*, 521 F.3d

472, 489 (5th Cir. 2008) (quoting *ACS Investors, Inc. v. McLaughlin*, 943 S.W.2d 426, 430 (Tex. 1997)).   An additional requirement is that the interfering party cannot be a party in the initial contract because every breach of contract claim would convert to a tortious interference claim without that requirement.  *Taylor v. Russell*, 181 F. Supp. 2d 668, 672 (E.D. Tex. 2001).  The first element will be satisfied here, as this Court has already discussed multiple times that Bar-Z and Patrick had signed a valid contract with provisions that survived the termination of the employment.  The Employment Agreement was subject to interference, meaning that the first element of the claim will be satisfied.

The second element requires some intent on behalf of App Star.  The requirement does not force Bar-Z to show that App Star acted with an intent to injure, but Bar-Z must establish that the "interference with the contract was intentional."  *Mission Toxicology, LLC v. Unitedhealthcare Ins. Co.*, 499 F. Supp. 3d 350, 361 (W.D. Tex. 2020) (quoting *Fluorine on Call, Ltd. v. Flourogas Ltd.*, 380 F.3d 849, 864 (5th Cir. 2004)).  "This means that [Bar-Z] has to prove that [App Star] intended to interfere with its contracts . . . or was substantially certain that such interference would result" from App Star's actions.  *Id.* (internal quotation marks omitted).  Here, the Court again points to the fact that Little called Rice and informed him of Patrick's obligations and the fact that nothing changed as a result of this call.  Whether it was Rice asking Patrick to retrieve his old materials that he acquired from Bar-Z—which this Court views as something App Star should be "substantially certain" that interference would occur—or Rice acknowledging Patrick's obligation when telling Little "what are you going to do about it," the Court finds that there is no fact issue present because App Star intended to interfere with the Employment Agreement.

The third element deals with causation.  What Bar-Z must show here is that App Star "took an active part in persuading a party to a contract to breach it."  *M-I LLC*, 733 F. Supp. 2d at 775

32

(quoting *Hambric Sports Mgmt., LLC v. Team AK, Inc.*, No. 3:09-CV-1662, 2010 WL 2605243, at *9 (N.D. Tex. June 29, 2010)).  The Court merely reiterates the facts that it highlighted to show App Star's intentional actions.  After his termination from Bar-Z, Patrick was living in his car and was without employment.  Rice and App Star took advantage of Patrick in his vulnerable state and repeatedly encouraged Patrick to violate the terms of his Employment Agreement.  The fact that Patrick was given a job, but it was made clear to him that he would be in working in the same market as Bar-Z and encouraged to provide any materials to App Star that he still possessed constitutes proximate cause.  The Court finds that this third element is satisfied.

Finally, Bar-Z must show harm that resulted because of the interference.  Bar-Z lost clients because of what App Star did, including a client that was on Bar-Z's potential client list.  Bar-Z lost business and as a result and it lost out on advertising revenue that it acquired with each chamber of commerce application.  Bar-Z also spent time and money on the Marketing Materials it created, and lost those trade secrets because Patrick either kept them after his position terminated or just gave them to his new company, all of which resulted in a loss for Bar-Z.  Having this information allowed its competitor to compete at the level Bar-Z had achieved without spending the time and money that Bar-Z did.  It is no question that Bar-Z suffered harm because of App Star's interference with the Employment Agreement.

However, App Star raises an affirmative defense, stating that Bar-Z's claim is barred "bv the doctrine of preemption by the Copyright Act" (Dkt. #66 at p. 7).  The Court agrees, as it relates to Bar-Z's exclusive right to the use of its trade secrets.  *See WeInfuse, LLC v. InfuseFlow, LLC*, No. 3:20-CV-1050, 2021 WL 1165132, at *5–*6 (N.D. Tex. March 26, 2021) (discussing that when tortious interference claims were based on the lost benefits flowing from exclusive rights to the software, they were preempted); *Huckshold v. HSSL, L.L.C.*, 344 F. Supp. 2d 1203, 1208 (E.D.

Mo. 2004) (finding that for plaintiff's specific tortious interference claim, plaintiff only need to prove an unauthorize copying and that was preempted).  To the extent Bar-Z's tortious interference claims relates to matters other than Bar-Z's benefits lost from its exclusive right of its trade secrets, it would not be preempted.  *See Gemcraft Homes, Inc. v. Sumurdy*, 688 F. Supp. 289, 295 (E.D. Tex. 1988).[4]  In conclusion, Bar-Z has satisfied its burden at the summary judgment stage to recover from App Star based on its tortious interference claim, to the extent that the claim does not relate to Bar-Z's exclusive right of its trade secrets.

### C.  Breach of Fiduciary Duty—Joint Tortfeasor

The final pending claim that Bar-Z has against App Star is the breach of fiduciary duty. While App Star did not directly owe a fiduciary duty to Bar-Z itself, under Texas law, "[w]hen a third party knowingly participates in the breach of a fiduciary duty, the third party becomes a joint tortfeasor and is liable as such." *Kinzbach Tool*, 160 S.W.2d at 513–14.  To establish knowing participation in a breach of fiduciary duty, a plaintiff must assert: "(1) the existence of a fiduciary relationship; (2) that the third party knew of the fiduciary relationship; and (3) that the third party was aware that it was participating in the breach of a fiduciary relationship.  *D'Onofio v. Vacaion Publications, Inc.*, 888 F.3d 197, 216 (5th Cir. 2018).

In *Kinzbach Tool*, the Texas Supreme Court heard a dispute between Corbett-Wallace and Kinzbach Tool Company.  *Kinzbach Tool*, 160 S.W.2d at 513–14.  When the two were planning on entering a contract with each other, Corbett contacted one of Kinzbach's employees and

---

[4] The Court will limit its conclusion as the *Sumurdy* court did.  The reason being that the parties have not fully briefed the issue of preemption and the Court does not have enough facts to conduct the two-factor analysis under § 301(a) to determine whether a state law claim is preempted here.  *Daboub* 42 F.3d at 288–89.  The case law identifies certain situations where a tortious interference claim may proceed and where it is preempted.  *See Telecom Technical Servs. Inc. v. Rolm Co.*, 388 F.3d 820, 833 (11th Cir. 2004) (no preemption); *Altera Corp. v. Clear Logic, Inc.*, 424 F.3d 1079, 1089–90 (9th Cir. 2005) (no preemption); *M-I LLC*, 733 F. Supp. 2d at 790 (preemption applied).  The argument that is before the Court includes App Star merely mentioning preemption in one sentence, and preemption is not again mentioned in the briefing by either party.  Additionally, the Court may not order additional briefing in this case given the fact that App Star has stopped responding.

promised him some of the commission if the deal was completed.  The employee did not inform Kinzbach of the "inside deal."  Kinzbach filed suit against both its employee and Corbett and alleged that both were liable for a breach of fiduciary duty.  The Texas Supreme Court found that Corbett was liable as a joint tortfeasor because it knowingly participated in the breach of fiduciary duty that existed between Kinzbach and its own employee.  The situation here is similar to *Kinzbach Tool*.  App Star played an active role in the breach of fiduciary duty between Patrick and Bar-Z.  As for the three necessary elements, the Court simply reiterates the facts that it has already pointed out: a fiduciary relationship existed between Bar-Z and Patrick, Little informed App Star about Patrick's obligations to Bar-Z, and App Star actively wanted to copy Bar-Z and used Patrick for that reason.  The Court finds that evidence conclusively shows that App Star will be liable to Bar-Z as a joint tortfeasor for the breach of fiduciary duty claim.

## IV.    App Star's Counterclaims

The only remaining claims are App Star's counterclaims against Bar-Z.[5]  There are four claims: (1) violation of the Digital Millenium Copyright Act ("DMCA"); (2) Tortious Interference; (3) declaratory relief relating to no copyright infringement; and (4) bad faith claims made under the Texas Uniform Trade Secrets Act and DTSA (Dkt. #66 at pp. 8–15).

An entity that abuses the DMCA may be subject to liability, under § 512(f).  *Tierra Caliente Music Group, S.A. De C.V. v. Ser-CA Discos, Inc.*, No. 7:18-CV-252, 2019 WL

---

[5] The Court need not conduct an analysis on App Star's remaining affirmative defenses to Bar-Z's claims.  App Star raises the same defenses that were asserted by Patrick without including the mandatory arbitration defense since App Star was not subject to that provision.  These defenses were already disposed of by the Court and the Court only reiterates those same reasons outlined in Part I.E of this Order.  The only difference in argument arises at the preemption defense, but the Court has already addressed App Star's preemption defense to the tortious interference claim.  Regarding the rest of the Bar-Z's claims, the Court finds that none of App Star's remaining claims are preempted by the Copyright Act.  *GlobeRanger Corp.*, 836 F.3d at 486 (trade secrets misappropriation is not preempted by the Copyright Act); *M-I LLC*, 733 F. Supp. at 790 (explaining that Fifth Circuit law is clear that a breach of fiduciary duty survives copyright preemption).  Therefore, the Court will proceed with App Star's counterclaims as the only remaining claims.

13109708, at *3 (S.D. Tex. Aug. 14, 2019) (slip op.).  The section prohibits "[a]ny person who knowingly materially misrepresents" to a service provider that material is infringing.  17 U.S.C. § 512(f).  The misrepresentation must cause the service provider to take down the material or no harm has been suffered.  *Tierra Caliente*, 2019 WL 13109708, at *7.  Here, on February 4, 2020, Bar-Z submitted a DMCA notification to Google Play and Apple that App Star's applications needed to be taken down.  Although App Star's applications were subsequently taken down by Google Play and App Star did suffer some harm, there is no evidence to satisfy the knowingly requirement.  App Star argues that Bar-Z did not own the copyrights and were therefore not allowed to submit DMCA notifications (Dkt. #66 at p. 12).  Additionally, App Star argues that the applications are denied copyright protection and that "Bar-Z knew or should have known that the design elements cited in the DMCA Notification" are not subject to protection under copyright law (Dkt. #66 at p. 13).  Neither argument is convincing enough to persuade the Court that Bar-Z knowingly made any material misrepresentations to the service providers.  The Court will dismiss this claim under the DMCA, as App Star will not be allowed to recover under this statute.

As for the tortious interference claim, App Star alleges that by submitting the DMCA notification to service providers, Bar-Z interfered with App Star's contracts with certain chambers of commerce (Dkt. #66 at pp. 13–14). While Bar-Z did interfere with App Star's existing contracts and intended to do so, Bar-Z is protected by the defense of justification that it raised in its response (Dkt. #81 at p. 7).  Under Texas law, legal justification is an affirmative defense to tortious interference with a contract and is based on the exercise of either one's own legal rights or a good faith claim to a colorable legal right.  *Settlement Capital Corp. v. BHS Structured Settlements, Inc.*, 319 F. Supp. 2d 729, 733 (N.D. Tex. 2004) (citing *Prudential Ins. Co. of Am. v. Financial Review Servs., Inc.*, 29 S.W.3d 74, 80 (Tex. 2000)).  Essentially, if Bar-Z can prove as a matter of law that

it had a legal right to interfere with a contract, then it has "conclusively established the justification defense, and the motive is irrelevant." *Id.* Here, the Court has already found that Bar-Z had a legal right to interfere with App Star's contracts with the chambers of commerce. Specifically, Bar-Z had a legitimate claim regarding App Star's wrongful actions in creating its applications. Bar-Z did not submit the DMCA notification with any bad faith and therefore, it was justified in making its claim to Google Play and the Apple App Store. The Court finds that Bar-Z has conclusively proven its justification defense, therefore, App Star's tortious interference claim will be dismissed.

App Star again asks for declaratory relief that no copyright infringement has occurred to "resolve this controversy" (Dkt. #66 at p. 15). Declaratory relief is not necessary here. The Court will reiterate that Bar-Z is not alleging any claims under copyright law. Therefore, a declaratory judgment consistent with App Star's request will not resolve the controversy. The Court will dismiss this claim and will not grant declaratory judgment in App Star's favor.

App Star's claims under the Texas Uniform Trade Secrets Act and DTSA are predicated on Bar-Z making its claims in bad faith. The Court is granting summary judgment in favor of Bar-Z for its claims under the Texas Uniform Trade Secrets Act and DTSA. The Court fails to see how the claims were made in bad faith. Because App Star has not raised any evidence to the contrary, the Court will find that App Star conclusively cannot prove bad faith for the purposes of this claim. Therefore, App Star's final counterclaim will be dismissed. Because the Court finds that none of App Star's counterclaims hold merit in this case, the Court need not address the remainder of Bar-Z's affirmative defenses to App Star's counterclaims.

In sum, App Star saw an opportunity to beat Bar-Z at its own game and took that opportunity through unlawful means. The simple truth is that both Patrick and Rice should have

listened to Little when he informed them of their wrongful actions, but they both decided to ignore him.  Now, both App Star and Patrick are liable for their actions and the harm that Bar-Z suffered. The Court has either granted or dismissed all the pending claims in this matter at the summary judgment level and will enter an order regarding the damages owed consistent with the rulings made in this Order.

## CONCLUSION

It is therefore **ORDERED** that Plaintiff's Motion for Summary Judgment (Dkt. #143) is hereby **GRANTED in part** and **DENIED in part.**  As to Bar-Z's claims, the Court will grant summary judgment in favor of all its claims, limiting the tortious interference claim against App Star, LLC, to the extent that the claim does not relate to Bar-Z's exclusive right of its trade secrets.

It is further **ORDERED** that Timothy Patrick and App Star LLC's Counterclaims are **DISMISSED with prejudice** because of the reasons discussed above.

**IT IS SO ORDERED.**

**SIGNED this 13th day of March, 2023.**

AMOS L. MAZZANT
UNITED STATES DISTRICT JUDGE